UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JULIE LYNN COULTER

      Plaintiff,

                              REPORT AND
                              RECOMMENDATION

      v.

                              15-CV-849A


NANCY A. BERRYHILL, [1]
ACTING COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,
    Defendant.
_____

## INTRODUCTION

Before the court are the parties' cross-motions for judgment on the pleadings [14,

17][2] which were referred to me for preparation of a Report and Recommendation [15]. For the

reasons stated below, I recommend that this case be remanded to the Acting Commissioner for

further proceedings.


## BACKGROUND

Plaintiff filed an application for Social Security Disability Benefits ("DIB") and

Social Security Supplemental Income ("SSI") on August 23, 2012 and August 29, 2012,

respectively (T. 89, 157-62).[3] Her initial applications were denied, and an administrative hearing

---

[1]    Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

[2]    Bracketed references are to the CM/ECF docket entries.

[3]    References denoted as "T" are to the transcript of the administrative record.

was subsequently held before Administrative Law Judge ("ALJ") Donald McDougall on March 3, 2014 (T. 50-73). On May 9, 2014, ALJ McDougall determined that plaintiff was not disabled (T. 27-49). The Appeals Council denied plaintiff's request for review on August 11, 2015, making the ALJ's determination the final decision of the Acting Commissioner (T. 1-6). Plaintiff thereafter commenced this action.

In her application, plaintiff stated that she could not work due to: problems in her back, neck and left arm; surgery on her right hand; depression; anxiety; left shoulder injury; numbness in her left pinky and ring finger; headaches; and an inability to sit, stand, or walk longer than a half hour due to pain (T. 212). She listed her height as 5'1" and weight as 175 pounds. Id.

Plaintiff was injured in an accident on June 11, 2010, when her car was struck by another vehicle (T. 384). She was taken to the emergency room at Niagara Falls Memorial Medical Center for complaints of left shoulder, arm, face, and right upper arm pain (T. 314). She also suffered abrasions to her face and right upper arm. Id. An X-ray of her cervical spine on June 11, 2010 showed mild reverse lordosis "which could be anatomical variation or could reflect some muscle spasm" (T. 320). She was discharged that day and told to follow up with her own doctors (T. 317).

Plaintiff was treated by a chiropractor, Dr. Michael J. Cardamone (T. 404-20, 431-50). Dr. Cardamone asked plaintiff to complete an "automobile accident questionnaire" in which she stated that her symptoms, including headaches, fatigue, sleeping problems, diarrhea, and loss of appetite, were "getting worse" (T. 405). She described her pain as "very severe", preventing her from sitting more than 10 minutes or standing more than one half hour, affecting her sleeping, and appetite, and requiring her to change the way she washed and dressed herself

(T. 406). With respect to "activities of daily living", plaintiff stated that tasks such as drying her hair, reaching or lifting more than 10 pounds gave her severe pain (T. 410). Standing, prolonged sitting, driving, lifting less than 10 pounds produced moderate pain. Id. Other tasks, such as bathing, walking, tying her shoes, making meals, dressing, produced mild pain. Id.

Upon examination during her initial appointment on June 16, 2009, Dr. Cardamone noted significantly reduced range of motion in both her cervical and lumbar spine (T. 409). The straight leg raise test, Yeoman's test,[4] and Kemp's test[5] were positive Id. Dr. Cardamone's motor evaluation revealed reduced findings in the C5 deltoid and left wrist. Id. There was also sensory loss at C5-6. Id. Dr. Cardamone opined that Plaintiff was temporarily totally disabled, and listed her prognosis as poor (T. 408).

Plaintiff saw orthopedic surgeon Dr. A. Marc Tetro at Pinnacle Orthopedic & Spine Specialists ("Pinnacle") on July 7, 2010 for her right hand and left shoulder injuries (T. 252-87, 291-96, 298-301, 389- 403, 421-30). Dr. Tetro noted left shoulder and right hand pain with neurologic symptoms including paresthesias, weakness, and numbness present occasionally to all five digits (T. 389). Upon examination he found: (1) a positive Hawkins test;[6] (2) a positive Neer's test[7] for rotator cuff impingement; (3) maximal tenderness about the rotator cuff insertion;

---

[4]    A Yoeman's test measures pain in the sacroiliac joint. Mitchell v. Colvin, 2016 WL 8674509, *4 (W.D.N.Y. 2016), report and recommendation adopted, 2016 WL 6775300 (W.D.N.Y. 2016).

[5]    A Kemp's test assesses the lumbar spine facet joints. It is a provocative test to detect pain, including radicular pain. Massion v. Colvin, 2016 WL 6680510, *3 (N.D. Ill. 2016) citing http://www.physio-pedia.com/KEMP_test.

[6]     The Hawkins test assesses "rotator cuff tendonitis or subacromial impingement." Mercado v. Colvin, 2016 WL 3866587, *4 (S.D.N.Y. 2016) citing Medical Dictionary (Farlex & Partners 2009), http://medical-dictionary.thefreedictionary.com/hawkins+test.

[7]    A "postitive Neer's test can indicate impingement of the rotator-cuff tendons of the shoulder". Schmidt v. Colvin, 2014 WL 4237124, *5 (C.D. Cal. 2014) citing Thomas W. Woodward, M.D. et al., The Painful Shoulder: Part 1. Clinical Evaluation, Am. Family Physician (May 15, 2000), available at http://www.aafp.org/afp/2000/0515/p3079.html.

and (4) that plaintiff's cross-body adduction was positive for AC joint[8] tenderness (T. 390). A Finkelstein's test[9] of plaintiff's right hand was positive for discomfort (T. 391). He also found tenderness at the CMC and STT joints[10]. Id.

Dr. Tetro diagnosed plaintiff as suffering from (1) left shoulder rotator cuff tendonitis; (2) left shoulder possible rotator cuff tear; (3) left shoulder post-traumatic AC joint arthrosis; (4) cervical origin pain; (5) right hand first extensor compartment tenosynovitis; and (6) right wrist posttraumatic trapeziometacarpal CMC/STT joint arthrosis. Id. He performed a Lidocaine injection into her shoulder (T. 392) and recommended thumb splints and anti-inflammatory medication for her right hand (T. 393). Dr. Tetro opined that plaintiff was totally disabled with respect to her usual occupation as a result of the accident. Id.

An MRI of plaintiff's cervical spine on July 28, 2010 showed concentric bulging of the disc at C5-6, without evidence of focal disc herniation or central canal stenosis; and (2) loss of normal cervical lordosis (T. 452). An MRI of the lumbar spine the same day showed concentric bulging of the disc at L5-S1, without evidence of lumbar disc herniation or spinal stenosis (T. 251).

On September 8, 2010, plaintiff was examined by an orthopedic surgeon, Dr. Cameron B. Huckell, for complaints of neck pain, back pain which radiated into the mid back,

---

[8]    "The AC joint is the acromioclavicular joint which is at the top of the shoulder. It is where the collar bone (clavicle) meets the highest point of the shoulder blade (scapula). The highest point of the scapula is the acromion". Dempkosky v. Astrue, 2012 WL 398250, *13 (M.D. Pa. 2012).

[9]    "The Finkelstein test is used to confirm whether a patient has de Quervain's tenosynovitis". Carter v. Covin, 2013 WL 4522366, *6 (E.D. Mo. 2013). According to Stedman's Medical Dictionary (28th Edition, 2006), de Quervain tenosynovitis is the "inflammation of the tendons of the first dorsal compartment of the wrist, which includes abductor pollicis longus and extensor pollicis brevis".

[10]    "The first CMC joint is the carpometacarpal joint where the thumb meets the carpal bones in the wrist. The STT joint is the scaphotrapezio-trapezoidal joint, which is the joint between three bones in the wrist, the scaphoid, the trapezium, and the trapezoid". Anderson v. Commissioner of Social Security, 2017 WL 522827, *2 (C.D. Ill. 2017) citing Dorland's Illustrated Medical Dictionary (32nd ed.) (Dorland's), at 298.

and intermittent numbness and paresthesias[11] to all five fingers of the left hand (T. 384-85). Upon examination, a straight leg raise test was positive bilaterally, and plaintiff's range of motion was limited in her cervical and lumbar regions of her back, left shoulder and wrist (T. 386). He did not recommend surgery because "there is good potential for healing at the spine naturally with time, but it may take months" (T. 387). Dr. Huckell stated that a review of plaintiff's MRI revealed bulging at the L5-S1 level "that can explain the patient's current symptoms" (T. 386). He opined that Plaintiff was "disabled at this time" and wrote that he would "reserve all further disability notes and any return to work to her treating chiropractor, Dr. Cardamone" (T. 387).

An x-ray performed on September 29, 2010 revealed bilateral subluxation[12] of the lateral masses of C1 over C2, suggestive of bilateral accessory spinous ligamentous instability (T. 454). The image also showed slight retrolisthesis[13] of C2 over C3, C3 over C4, and C4 over C5 in the neutral lateral projection as well as in the neutral projection to full extension views, and mild reversal of the cervical lordosis. Id. Plaintiff underwent physical therapy for her left shoulder from January 25, 2011 to March 9, 2011 (T. 470-84).

On March 24, 2011, plaintiff was consultatively examined by Dr. Donna Miller (T. 303-06). Dr. Miller found that plaintiff had limited range of motion in her cervical spine, lumbar spine and left shoulder (T. 305). She diagnosed plaintiff as suffering from: (1) chronic

---

[11]     According to Stedman's Medical Dictionary (28th Edition, 2006), paresthesia is "a spontaneious abnormal usually nonpainful sensation (e.g., burning, pricking); may be due to lesions of both the central and peripheral nervous systems".

[12]     According to Stedman's Medical Dictionary (28th Edition, 2006), subluxation is an "incomplete luxation or dislocation; although a relationship is altered, contact between joint surfaces remains".

[13]     "Retrolisthesis" indicates posterior displacement of one vertebral body on the subjacent body. Hawthorne v. Astrue, 493 F. Supp. 2d 838, 849 (S.D. Tex. 2007) citing Dorland's Illustrated Medical Dictionary (29th ed. 2000), at 1569.

neck pain, herniated cervical disc; (2) chronic low back pain, history of herniated lumbar disc; (3) left shoulder pain, possible labral tear; and (4) right hand pain (T. 305). Dr. Miller opined that plaintiff had a mild limitation for heavy lifting, bending, turning, twisting, reaching, pushing, pulling, and repetitive use of her hand (T. 306).

On that same date, plaintiff also underwent a consultative psychiatric evaluation by Dr. Renee Baskin (T. 307-10). She noted that plaintiff was "restless" as she repositioned herself or stood up to alleviate pain and discomfort (T. 308). Dr. Baskin diagnosed plaintiff with: (1) adjustment disorder with mixed anxiety and depressed mood; and (2) pain disorder associated with general medical condition (T. 310). She opined that plaintiff had a moderate limitation being able to deal with stress, and "medical/physical" problems which might interfere with her ability to maintain a regular schedule (T. 309). Dr. Baskin concluded that the results of her examination were consistent with stress-related and psychiatric problems that "may interfere to some degree with [plaintiff's] ability to function on a daily basis" (T. 309-10).

From December 15, 2011 through May 29, 2012, plaintiff was treated by pain management specialist Dr. Bernard Beaupin (T. 263-66458-69). He noted that plaintiff complained of head, neck, and low back pain with left arm numbness and tingling (T. 263, 466). She described her cervical spine pain as ranging from 5/10 to 10/10 and her lumbar spine pain as being dull with intermittent sharp episodes ranging from 2/10 to 6/10 (T. 467). He also noted that the prescription of tramadol she was taking for pain "makes her significantly fatigued" (T. 266).[14] Upon examination, Dr. Beaupin found that plaintiff's range of motion in her cervical and lumbar spine was limited by 25-50% in all ranges, with lumbar spine extension significantly painful particularly when combined with right and left lateral bending (T. 467-68). He also found that

---

[14]    Dr. Beaupin stated that he wanted to try plaintiff on Tylenol with codeine (T. 266), but subsequently noted that this combination "failed" (T. 463).

the range of motion in her left shoulder was limited in abduction and internal rotation. Id. Dr.

Beaupin noted positive findings in the ulnar stretch test, Tinel's sign test,[15] Adson's test,[16]

Milgram's test,[17] Yeoman's test, and forced lumbar extension test. Id. In addition, he found

cervical spine compression causing left arm numbness and axial spine pain, as well as muscle

spasms and trigger points throughout plaintiff's cervical and lumbar paraspinals. Id. Finally,

there was a spasm of the scalene muscle in the anterior cervical musculature on the left, which

resulted in numbness and tingling in her left arm when palpated. Id.

Dr. Beaupin stated that Plaintiff was "disabled" and diagnosed her with cervical

disc herniation, cervical radiculitis, left thoracic outlet syndrome, occipital neuralgia, and chronic

pain due to trauma (T. 468). He noted that she appeared to have occipital neuralgia as well as

some cervicogenic pain resulting in headaches for which he performed bilateral occipital nerve

blocks during that visit. Id. He stated that he would treat plaintiff with trigger point injections

and that plaintiff should continue with conservative chiropractic care. Id. He prescribed

Amitriptyline in the evening and Naproxen twice a day for pain. Id.

On February 17, 2012, Dr. Beaupin noted that the nerve block relieved plaintiff's

headaches for only one week and the Naproxen was not helpful in relieving pain (T. 463). He

stated that chiropractic treatment provided good pain relief, but only for a few days at a time. Id.

Repeated clinical tests were positive and unchanged from the last visit (T. 464). Dr. Beaupin

treated plaintiff with trigger point injections (T. 466). He again opined that plaintiff was disabled

---

[15]    According to Stedman's Medical Dictionary (28th Edition, 2006), a Tinel's sign is a "sensation of tingling, or of 'pins and needles,' felt at the lesion site or more distally along the course of a nerve when the latter is percussed; indicates a partial lesion or early regeneration in the nerve".

[16]    According to Stedman's Medical Dictionary (28th Edition, 2006), an Adson's test is used to investigate the possibility of thoracic outlet syndrome.

[17]    A Milgram's test "usually confirms pathology either inside or outside the spinal cord sheath". Rosario v. Colvin, 2016 WL 2342008, *2 (W.D.N.Y. 2016).

(T. 466). Dr. Beaupin administered more trigger point injections on March 2, 2012 (T. 460). Upon examination, Dr. Beaupin noted numerous, positive clinical tests that were unchanged from the last visit (T. 461) and repeated his opinion that plaintiff was disabled (T. 462).

On May 21, 2012, Dr. Tetro performed surgery on plaintiff's right wrist, including the following procedures: right wrist trapeziometacarpal CMC (carpometacarpal) capsulorrhaphy for instability, right wrist APL (abductor pollicis longus) tendon transfer for CMC ligament reconstruction (a "distinct and separate surgical procedure performed through the same surgical incision"), and right wrist first extensor compartment tenosynovectomy (T. 272).

Dr. Beaupin and reported some improvement in plaintiff's neck and left arm symptoms on May 29, 2012 (T. 458) however he continued to opined that plaintiff was disabled (T. 459). On July 12, 2012, Dr. Tetro performed additional surgery on plaintiff's second right wrist to remove hardware used during the initial surgery (T. 295).

On October 30, 2012, plaintiff underwent a second consultative examination by Dr. Miller (T. 330-34). Dr. Miller again found plaintiff's range of motion to be limited in her cervical and lumbar spine, as well as in her left shoulder (T. 332). She noted plaintiff's height as 5' 1" and that her weight had increased to 210 pounds (T. 331). Dr. Miller diagnosed plaintiff as suffering from: (1) chronic neck pain, bulging cervical disc; (2) headaches; (3) chronic low back pain, bulging lumbar disc; (4) chronic left shoulder pain; and (5) status post right carpal metacarpal repair (T. 333). She concluded that plaintiff has mild to moderate limitation with heavy lifting, bending, carrying, reaching, pushing, and pulling. Id.

A consultative psychiatric evaluation was performed by Dr. Thomas Ryan on October 30, 2012 (T. 335-38). Dr. Ryan found Plaintiff's recent and remote memory skills to be mildly impaired (T. 336-37). He stated that her mood was neutral, attention and concentration

were intact, and insight and judgment were adequate. Id. Dr. Ryan estimated plaintiff's intellectual functioning to be below average (T. 337). He diagnosed plaintiff with adjustment disorder with depressed mood. Id. In his opinion, plaintiff would have mild difficulty dealing with stress and the ability to perform some complex tasks independently. Id. He concluded that the results of the examination were consistent with plaintiff having psychiatric problems "which that may interfere to some degree on a daily basis" Id.

On December 27, 2013, plaintiff was examined by Dr. Christopher Hamill, an orthopedic surgeon (T. 361). She complained of worsening neck and low back pain, as well as left shoulder and left leg pain. Id. Plaintiff reported that her pain was constant and worsened with activity. Id. Upon examination, Dr. Hamill found a positive left shoulder impingement sign (T. 362). He recommended conservative care with a pain management specialist and a shoulder specialist. Id.

On February 18, 2014, plaintiff was examined by Dr. John C. Newman, another orthopedic surgeon, due to continued pain in her left shoulder, as well as pain, soreness, stiffness, and numbness/tingling in her right hand and wrist (T. 455). Dr. Newman found plaintiff to have limited range of motion in her left shoulder (T. 456) which he described as "an obvious frozen shoulder" (T. 457). With respect to her right hand, he noted: (1) a positive Tinel's sign: (2) weakness of abduction of the small finger; (2) weakness of opposition of the thumb and index finger; (3) decreased sensation in the thumb, index finger, and middle finger: (4) extension of about 40 (out of 60) degrees; (5) flexion of 40 (out of 60) degrees; and (6) tenderness in the area of the distal radiocarpal joint (T. 456). An x-ray of plaintiff's right wrist revealed a narrowing of the carpal navicular and lunate interspace suggesting some degree of advancing osteoarthritis. Id. Dr. Newman also noted tenderness in the trapezial area especially on the left side as well as a

limited range of motion in plaintiff's neck. Id. He prescribed Mobic 500mg for the right wrist and placed her in a night splint for the "obvious carpal tunnel syndrome" (T. 457).

On August 3, 2015, Dr. Cardamone completed a "Medical Source Statement" (T. 501-03) and Physical Capacities Evaluation (T. 504-05). He stated that plaintiff could not perform sedentary or light work (T. 502) even if she had the freedom to alternate sitting and standing during the work day (T. 503). He stated that plaintiff is suffering from cervical and lumbar issue related to a motor vehicle accident and that she has had extensive surgery on her wrist and hand. Id. Dr. Cardamone, stated that plaintiff can only sit for 1 hour, stand for 1 hour, and walk for 1 hour in an 8- hour workday; can only push or pull 5 pounds (T. 504). He also felt that Plaintiff's obesity was a significant factor in limiting her ability to perform basic work-related activities (T. 505). He opined that plaintiff "still is in severe pain and remains totally disabled" (T. 503).

ALJ McDougall determined that plaintiff could perform light work as defined in 20 C.F.R. 404.1567(b), except that she could not use her "left arm such as to elevate it more than a 90 degree angle to the body; no twisting or rotation or use of the right hand or wrist more than frequently; and any job should not be assembly line or fast paced work" (T. 35). Plaintiff asserts that ALJ McDougall failed to properly evaluate the opinion of Dr. Cardamone. Plaintiff's Memorandum of Law [14-1], p. 18. She also argues that ALJ McDougall failed to consider the limiting effects of her obesity (id. at p. 22) and failed to find that plaintiff's headaches constitute a severe impairment. Id. at 25.

**ANALYSIS**

**A. Standard of Review**

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." <u>Shaw v. Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. §405(g)). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion". <u>Consolidated Edison Co. of New York. Inc. v. NLRB</u>, 305 U.S. 197, 229 (1938).

For purposes of entitlement to disability insurance benefits, a person is considered disabled when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months". 42 U.S.C. §§423(d)(1)(A) & 1382c(a)(3)(A). Such a disability will be found to exist only if an individual's "physical or mental impairment or impairments are of such severity that [he or she] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §§423(d)(2)(A) & 1382c(a)(3)(B).

In order to determine whether plaintiff is suffering from a disability, the following five-step inquiry must be employed:

"1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a 'severe impairment' which limits his or her mental or physical ability to do basic work activities.

- 11 -

3. If the claimant has a 'severe impairment,' the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not 'listed' in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform."

Shaw, 221 F.3d at 132; 20 C.F.R. §§404.1520, 416.920. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps. *See* Talavera v. Astrue, 697 F.3d 145 (2d. Cir. 2012); 20 C.F.R. §§404.1520, 416.920. Moreover, the ALJ has an affirmative duty to fully develop the record where deficiencies exist. *See* Gold v. Secretary, 463 F.2d 38, 43 (2d. Cir. 1972); Swiantek v. Acting Commissioner of Social Security, 588 Fed. Appx. 82, 84 (2d. Cir. 2015) (Summary Order).

## B.    Failure to Identify Headaches as a Severe Impairment

Plaintiff argues that ALJ McDougall erred by failing to identify her headaches to be a severe impairment. Plaintiff's Memorandum of Law [14-1], p. 25. Plaintiff testified that she gets headaches, which she described as migraines, once or twice a week (T. 57). She stated that when she gets them, she has to go into a dark, quiet room. Id. She also stated that she was prescribed Fioricet[18] for the headaches (T. 58). Plaintiff testified that the Fioricet made her feel "loopy . . . dizzy . . . sedated" for 45 minutes to an hour (T. 60).

---

[18]   Fioricet is a "combination medication . . . used to treat tension headaches." Smith v. Colvin, 2013 WL 4519782, *8 (E.D.N.Y. 2013).

The determination of whether or not an impairment is severe at step 2 of the sequential evaluation process is intended only to screen out *de minimus* claims. Dixon v. Shalala, 54 F.3d 1019, 1030-31 (2nd Cir.1995); *see also* Wilson v. Colvin, 2015 WL 1003933, *19 (W.D.N.Y. 2015) (following Dixon). Thus, a "finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality . . . [with] no more than a minimal effect on an individual's ability to work'". Rosario v. Apfel, 1999 WL 294727, *5 (E.D.N.Y. 1999) (*quoting* SSR 85–28, 1985 WL 56856, *3 (January 1, 1985)).

ALJ McDougall did not discuss plaintiff's headaches when determining plaintiff's severe impairments at step 2 of the sequential process (T. 33). Later in his opinion, he did note that plaintiff complained of severe headaches which interfered with her ability to function such that she had to go in a dark, quiet room or take Fioricet, and that the Fioricet made her feel loopy, dizzy or sedated (T. 36). ALJ McDougall subsequently suggested that occipital blocks and cervical injections "helped" plaintiff's headaches (T. 38), but again did not address whether plaintiff was able to maintain such treatment or whether the nerve blocks alleviated plaintiff's headache symptoms such that they had no more than a minimal effect on her ability to perform work activities. Indeed, notwithstanding the occipital nerve blocks, Dr. Beaupin continued to opine that plaintiff remained disabled (T. 459, 462, 466, 468).

Currently, there is no clinical test to confirm the existence of headaches. Randel v. Colvin, 2016 WL 1223363, *23 (N.D.N.Y. 2016), report and recommendation adopted, 2016 WL 1238240 (N.D.N.Y. 2016) ( "[b]ecause there is no test for migraine headaches, when presented with documented allegations of symptoms which are entirely consistent with the symptomatology for evaluating [the claimed disorder], the Secretary cannot rely on the ALJ's rejection of the claimant's testimony based on the mere absence of objective evidence"), *quoting*

Sech v. Commissioner of Social Security, 2015 WL 1447125, *3 (N.D.N.Y. 2015). *See also*

Groff v. Commissioner of Social Security, 2008 WL 4104689, *6–8 (N.D.N.Y. 2008) ("to place

such emphasis on the absence of "any specific evaluation or treatment" is not only a

misstatement of the medical evidence, but is also a misreckoning of the elusive task a doctor

faces in diagnosing this impairment as there exists no objective clinical test which can

corroborate the existence of migraines").

      Here, in addition to plaintiff's testimony, the record reflects that plaintiff

repeatedly complained of headaches to her medical providers (T. 212, 263, 330, 384, 458, 463,

468, 491). Dr. Miller (T. 333) and Dr. Ryan (T. 337), to whose consultative opinions ALJ

McDougall gave great weight, both diagnosed plaintiff as suffering from headaches, with Dr.

Miller listing headaches as plaintiff's second most prominent impairment (T. 333).[19] Dr. Beaupin

opined that plaintiff's headaches were the result of "occipital neuralgia as well as some

cerviogenic pain" (T. 468). He treated plaintiff's headaches with bilateral occipital nerve blocks.

Id. Dr. Beaupin reported that the nerve blocks "relieved her headaches for about one week" (T.

463) and that the headaches were recurrent (T. 460). In her last appointment with Dr. Beaupin,

plaintiff reported that "with increased rest she [had] decreased headaches and pain symptoms"

(T. 459). The extent of the "rest" required to obtain relief, the degree of relief obtained from this

method, and the extent to which such self-help would interfere in plaintiff's ability to perform

work related activities is not clear from the record. The record also does not reflect whether the

occipital nerve blocks were a long-term solution to plaintiff's headaches or that the treatment

---

[19]   Although Dr. Miller listed headaches as a prominent diagnosis, she did not provide any findings or opinions as to what effect (large or small) the headaches could have upon plaintiff's ability to perform daily work activities. Instead, Dr. Miller's assessment focused only on plaintiff's limitations with heavy lifting, bending, carrying, reaching, pushing and pulling (T. 333).

controlled them such that they had less than a minimal effect on her ability to perform work activities on a daily basis.

It is not clear why plaintiff stopped seeing Dr. Beaupin after May 29, 2012, but ALJ McDougall acknowledges that plaintiff stopped certain medical treatment because her insurance "ran out" (T. 39) and that she no longer gets chiropractic care because she cannot afford it (T. 36).[20] The Acting Commissioner's argument that plaintiff did not meet her burden to present evidence that her headaches were severe (Acting Commissioner's Memorandum of Law [17-1], p. 26) is not persuasive. The record in this case amply supports plaintiff's claim that she experiences and has received treatment for headaches, which may impact her ability to perform work related activities on a daily basis. ALJ McDougall made no attempt to obtain a medical opinion regarding the functional limitations imposed by plaintiff's headaches (or from the medication she takes) or to otherwise properly address whether plaintiff's headaches constituted a severe impairment at stage 2 of the sequential process. This error requires that this case be remanded for further proceedings as to whether: (1) plaintiff's headaches constitute a severe impairment, and if so; (2) the extent to which the headaches impact plaintiff's ability to perform work related activities on a daily basis.

---

[20] Regarding plaintiff's inability to afford continuing treatment, ALJ McDougall faulted plaintiff, stating "there is no indication that she sought free medical care" when her insurance ran out (T. 39). ALJ McDougall does not identify the source of the free medical care to which he was referring. In any event, it is improper to make a negative inference from the fact that a claimant did not obtain treatment based on a lack of financial resources. Bernadel v. Commissioner of Social Security, 2015 WL 5719725, *14 (E.D.N.Y. 2015) ("[c]ourts in this Circuit have observed that a claimant's credibility regarding her impairments should not be discounted for failure to obtain treatment she could not afford".) citing Shaw v. Chater, 221 F.3d 126, 133 (2d Cir.2000) ("[i]t would fly in the face of the plain purposes of the Social Security Act to deny claimant benefits because he is too poor to obtain additional treatment").

## C.    Dr. Cardamone's Opinion

Plaintiff also asserts that the Appeals Council failed to properly consider the opinion of Dr. Cardamone reflected in various assessments dated August 3, 2015 (T. 501-05) which were submitted upon administrative appeal. Plaintiff's Memorandum of Law [14-1], p. 18. The Appeals Council stated that it "considered" Dr. Cardamone's reports (T. 2, 5), but merely concluded without discussion that "this information does not provide a basis for changing the [ALJ's] decision" (T. 2).

Dr. Cardamone's opinion, if given substantial weight, would have required a favorable disability determination because his residual functional capacity assessment would preclude plaintiff from performing either sedentary or light work, even if she were able to alternated sitting and standing (T. 502-03). He also stated that plaintiff's obesity was a significant factor in limiting her ability to perform work-related activities (T. 505).

It is not clear that the Appeals Council must in all cases provide "good reasons" for failing to credit newly submitted material evidence when denying review of an ALJ's determination. Although several district courts in the Second Circuit have held that the Appeals Council is required to do so,[21] in Lesterhuis v. Colvin, 805 F.3d 83 (2d Cir. 2015), the court expressly declined to rule on the issue, stating:

> "because we hold that the ALJ's decision was not supported by substantial evidence, we need not consider Lesterhuis's alternative argument that the Appeals Council has an independent obligation to provide 'good reasons' before declining to give weight to the new, material opinion of a treating physician submitted only to the Appeals Council and not to the ALJ. See 20 C.F.R. § 404.1527(c)(2)."

805 F.3d at 89.  See also Messecar v. Colvin, 2016 WL 6574077, *4-5 (W.D.N.Y. 2016).

---

[21]    See, e.g., James v. Commissioner of Social Security, 2009 WL 2496485, *10 (E.D.N.Y. 2009); Lucas v. Astrue, 2009 WL 3334345, *5 (N.D.N.Y. 2009); Farina v. Barnhart, 2005 WL 91308, *5 (E.D.N.Y. 2005); Lebow v. Astrue, 2015 WL 1408865, *5 adopted 2015 WL 1439270 (S.D.N.Y. 2015); Rayburn v. Colvin, 2015 WL 8482780, *3 (W.D.N.Y. 2015).

In <u>Lesterhuis</u>, however, the court determined that "once evidence is added to the record, the Appeals Council must then consider the entire record, including the new evidence, and review a case if the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record". <u>Id.</u> at 87, *citing* 20 C.F.R. §404.970(b). Similarly, <u>Lesterhuis</u> requires that when reviewing the final agency decision, the court must consider the entire administrative record, "*which includes the new evidence*, and determine, as in every case, whether there is substantial evidence to support the decision of the [Acting Commissioner]". <u>Id.</u> (emphasis added). Thus, in <u>Lesterhuis</u>, the court found that the ALJ's decision was not supported by substantial evidence because the new information "contradicted the ALJ's conclusion in important respects". <u>Id.</u> at 88.[22]

Here, Dr. Cardamone's assessment contradicted ALJ McDougall's conclusion that plaintiff had the residual functional capacity to perform light work. While this evidence may not be entitled to controlling weight because it comes from a chiropractor and not a physician,[23] it must still be considered and may alter the weight of the evidence. Today, many people receive medical treatment primarily from "other medical sources" such as chiropractors, nurse practitioners ("NPs") and physician's assistants ("PAs"). Increasingly such professionals are the primary medical providers to many patients who have limited access to physicians. Often, the

---

[22]   While such a standard would seem to require some analysis of the newly submitted evidence in relation to the record as a whole. The court cautioned against making factual and medical determinations about the evidence before the agency. <u>Id.</u> at 88-89.

[23]   Chiropractors "are considered other sources pursuant to the SSA's regulations and that their opinions 'are important and should be evaluated on key issues such as impairment severity and functional effect'". <u>Labonte v. Berryhill</u>, 2017 WL 1546477, *3 (W.D.N.Y. 2017) *quoting* S.S.R. 06-03p, 2006 WL 2329939, at *2-3 (S.S.A. 2006). *See also* "[N]urse practitioners and physicians' assistants ("PAs") are defined as 'other sources' whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight." <u>Genier v. Astrue</u>, 298 F. App'x 105, 108 (2d Cir.2008), *citing* 20 C.F.R. § 416.913(d)(1).

reports and opinions by such sources are the only evidence in the record for substantial intervals of time.

Moreover, the Social Security Administration rulings *require* information from such sources to be considered. *See* 20 C.F.R. 416.913(d)(1). As Social Security Ruling ("SSR") 06-03P, 2006 WL 2329939, [24] explains:

> "With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."

Id. at *3. Indeed, the SSR states that "[a]lthough there is a distinction between what an adjudicator[25] must consider and what the adjudicator must explain in the disability determination or decision, *the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning*, when such opinions may have an effect on the outcome of the case. Id. at *6 (emphasis added).

---

[24]     SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration". Nelson v. Apfel, 210 F.3d 799, 803 (7th Cir. 2000) (internal citations omitted); *see* 20 C.F.R. §402.35(b)(1). While the Court is "not invariably bound by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating". Liskowitz v. Astrue, 559 F.3d 736, 744 (7th Cir. 2009).

[25]     The Appeals Council is an "adjudicator" even where it merely denies review of an ALJ's decision. *See* Martinez ex rel. T.P. v. Colvin, 2013 WL 1194234, *2 (N.D. Texas), adopted 2013 WL 1197743 (N.D. Texas 2013) (the adjudicator of a claim is "not just the ALJ, but any entity adjudicating a claim for benefit o[n] behalf of the Commissioner").

As noted above, if given significant weight, Dr. Cardamone's assessment would require a favorable disability determination. His residual functional capacity assessment appears to be the only evaluation from an examining medical provider to specifically address the duration which plaintiff could lift, carry, push, pull, sit, stand, or walk in an eight-hour work day. His conclusions are consistent with: the opinions of treating physicians Dr. Beaupin (T.468, 462, 459), Dr. Tetro (T. 393), and Dr. Huckell (T. 386-87); the objective diagnostic images showing subluxation and retrolisthesis at various points in plaintiff's spine (T. 454) as well as bulging discs at C5-6 and L5-S1 (T. 251, 452 ); the persistent findings of a decreased range of motion (T. 409, 386, 305, 467-68, 332); and positive clinical findings in the Yeoman's test, the Kemp's test, the Hawkins test, the Neer's test, and the Finkelstein test (T. 409, 389). Therefore, upon review of the entire record, including the new material submitted by Dr. Cardamone, as required under Lesterhuis, I cannot conclude that ALJ McDougall's decision is supported by substantial evidence.

I have recommended that this case be remanded on other grounds. On remand, the Acting Commissioner should also more fully address the residual functional capacity assessment submitted to the Appeals Council by Dr. Cardamone.


**Failure to Consider Obesity**

Finally, plaintiff also argues that ALJ McDougall failed to properly consider plaintiff's obesity when assessing her residual functional capacity. Plaintiff's Memorandum of Law [14-1], p. 22. The record reflects that plaintiff is 5'1" tall and that her weight fluctuated over time. In her application, plaintiff she stated that weighed 175 pounds (T. 212). During the

hearing she testified that she weighed 170 pounds (T. 55), while Dr. Miller recorded her weight to be 210 pounds (T. 331).

ALJ McDougall does not discuss whether plaintiff's weight would have any limiting effect on her ability to perform work related activities. His only reference to her weight was in response to plaintiff's claim that she experienced a loss of appetite, which he suggested was "not support[ed]" by the fact that she weighed 170 pounds (T. 39).[26]

A review of the record does not reflect any discussion of the limiting effects of plaintiff's weight aside from Dr. Cardamone's statement in his August 3, 2015 assessment suggesting that her obesity was "a significant factor" in limiting her ability to perform basic work activities (T. 505). Because I am recommending that this case be remanded on other grounds, including the consideration of Dr. Cardamone's August 3, 2015 submission, the Acting Commissioner should also consider whether plaintiff's obesity impacts her ability to perform work related activities.

## CONCLUSION

For these reasons, I recommend that plaintiff's motion for judgment on the pleadings [14] be granted to the extent that this case should be remanded to the Acting Commissioner for further proceedings, and that the Acting Commissioner's motion for judgment on the pleadings [17] be denied.

---

[26]   Because he does not account for the fact that plaintiff's weight had been recorded as high as 210 pounds (T. 331), his conclusion that plaintiff's weight of 170 pounds refuted her claim of a diminished appetite is not well supported by the record. Indeed, in light of his failure to demonstrate any valid connection between plaintiff's appetite and her weight, ALJ McDougall's conclusion in this regard was inappropriate at best, and insulting at worst.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by September 19, 2017. Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated: September 5, 2017

/s/Jeremiah J. McCarthy
_____
   JEREMIAH J. MCCARTHY
United States Magistrate Judge